## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### Evansville Division

MATTHEW VONSALZEN,

              Plaintiff,

     vs.

VECTREN CORPORATION, CARL L. CHAPMAN, DERRICK BURKS, JAMES H. DEGRAFFENREIDT, JR., JOHN D. ENGELBRECHT, ANTON H. GEORGE, ROBERT G. JONES, PATRICK K. MULLEN, R. DANIEL SADLIER, MICHAEL L. SMITH, TERESA J. TANNER, and JEAN L. WOJTOWICZ,

              Defendants.

Civil Case No.: 3:18-cv-122

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

### COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Matthew VonSalzen ("Plaintiff") brings this action for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this Complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action against Vectren Corporation ("Vectren" or the "Company") and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On April 23, 2018, CenterPoint Energy, Inc. ("Parent") and the Company announced that they had entered into an Agreement and Plan of Merger ("Merger Agreement") pursuant to which a wholly owned subsidiary of CenterPoint, Pacer Merger Sub, Inc. ("Merger

Sub" and together with Parent, "CenterPoint"), will acquire all outstanding shares of Vectren for $72.00 in cash for each share of Vectren common stock (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $27 billion.

3.    On June 18, 2018, Defendants issued materially incomplete and misleading disclosures in the Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy Statement is deficient and misleading in that it fails to provide adequate disclosures of all material information related to the Proposed Transaction.

4.    Accordingly, Plaintiff alleges herein that Defendants have breached their fiduciary duties and violated Sections 14(a) and 20(a) of the Exchange Act in connection with the filing of the Proxy Statement. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) Vectren is incorporated in this District, and one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

2

8.     Plaintiff Matthew VonSalzen is, and has been at all relevant times, the owner of shares of Vectren common stock.

9.     Defendant Carl L. Chapman ("Chapman") is the Chairman, President, & CEO of Vectren. He has served as a director of Vectren since 2009.

10.     Defendant Derrick Burks ("Burks") has served as a director of Vectren since 2017.

11.     Defendant James H. Degraffenreidt, Jr. ("Degraffenreidt") has served as a director of Vectren since 2010.

12.     Defendant John D. Engelbrecht ("Engelbrecht") has served as a director of Vectren since 1999.

13.     Defendant Anton H. George ("George") has served as a director of Vectren since 1999.

14.     Defendant Robert G. Jones ("Jones") has served as a director of Vectren since 2011.

15.     Defendant Patrick K. Mullen ("Mullen") has served as a director of Vectren since 2014.

16.     Defendant R. Daniel Sadlier ("Sadlier") has served as a director of Vectren since 2003.

17.     Defendant Michael L. Smith ("Smith") has served as a director of Vectren since 2006.

18.     Defendant Teresa J. Tanner ("Tanner") has served as a director of Vectren since 2015.

19.     Defendant Jean L. Wojtowicz ("Wojtowicz") has served as a director of Vectren since 1999.

20.     Defendants Burks, Chapman, Degraffenreidt, Jr., Engelbrecht, George, Jones, Mullen, Sadlier, Smith, Tanner, and Wojtowicz are collectively referred to herein as the "Board" or the "Individual Defendants."

21.     Defendant Vectren Corporation is an energy holding company headquartered in Evansville, Indiana. The Company is incorporated in Indiana and maintains its principal offices at

One Vectren Square, 211 N.W. Riverside Drive, Evansville, Indiana 47708. Vectren's common stock is traded on the New York Stock Exchange under the symbol "VVC."

22.    The Individual Defendants and Vectren are referred to collectively herein as "Defendants."

## OTHER RELEVANT ENTITIES

23.    CenterPoint, a Texas corporation, is a public utility holding company. CenterPoint Energy's operating subsidiaries own and operate electric transmission and distribution and natural gas distribution facilities, supply natural gas to commercial and industrial customers and electric and natural gas utilities and owns interests in Enable Midstream Partners, LP ("Enable").

24.    Merger Sub is an Indiana corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## FACTUAL BACKGROUND

### A.  Background of the Company and the Proposed Transaction

25.    Incorporated on June 10, 1999, Vectren was formed from the merger of Indiana Gas Company and Southern Indiana Gas and Electric Company.

26.    The Company is a Fortune 1000 energy holding company headquartered in Evansville, Indiana. Vectren's energy delivery subsidiaries provide gas and/or electricity to more than 1 million customers in adjoining service territories that cover nearly two-thirds of Indiana and about 20 percent of Ohio, primarily in the west-central area.

27.    Additionally, Vectren's nonutility subsidiaries and affiliates offer energy-related products and services to customers throughout the U.S. These include infrastructure services and energy services.

28.    Vectren Corporation employs more than 1,800 people, and more than 5,600 when including Vectren's nonutility companies, and is well-positioned for financial growth in light of its recent financial performance. In fact, in the first quarter of 2018, Vectren reported first quarter 2018 net income of $63.5 million, or $0.76 per share, compared to net income of $55.4 million, or $0.67 per share, in the first quarter of 2017.

29.     Despite its recent financial performance and prospects for future growth as a stand-alone energy company, on April 21, 2018, the Individual Defendants caused Vectren to enter into the Merger Agreement with CenterPoint.

30.     In a press release dated April 23, 2018, Vectren announced that it had entered into a Merger Agreement with CenterPoint pursuant to which CenterPoint will acquire all of the outstanding shares of Vectren.

31.     The press release states in pertinent part:

IRVINE, HOUSTON and EVANSVILLE, Ind., April 23, 2018 /PRNewswire/ - - CenterPoint Energy, Inc. (NYSE: CNP) and Vectren Corporation (NYSE: VVC) today announced they have entered into a definitive merger agreement to form a leading energy delivery, infrastructure and services company serving more than 7 million customers across the United States.

Under the terms of the agreement, which have been unanimously approved by both CenterPoint Energy's and Vectren's Boards of Directors, Vectren shareholders will receive $72.00 in cash for each share of Vectren common stock. CenterPoint Energy will also assume all outstanding Vectren net debt.

"This merger represents a significant step toward our vision to lead the nation in delivering energy, service and value. By combining our two highly complementary companies, we are creating an energy delivery, infrastructure and services leader that will drive value for our shareholders and customers, while enhancing growth opportunities for our businesses," said Scott M. Prochazka, president and chief executive officer of CenterPoint Energy. "From the evolution of customer expectations to the development of innovative technologies, this is a time of extraordinary opportunity for our industry. As a combined company, we will continue to focus on a future that benefits our customers, employees, communities and shareholders."

Vectren Chairman, President and Chief Executive Officer Carl L. Chapman said, "With CenterPoint Energy, we've found the right partner to begin the next chapter for Vectren and our family of companies. They share the same core values and dedication to the communities they serve, which is evidenced by the commitments they have made to our employees, philanthropic outreach, and Evansville, Ind., our home, where CenterPoint Energy will locate the newly combined company's natural gas utility operations headquarters. Together, we will be a stronger, more competitive company that will be well-positioned to continue to provide value for our stakeholders in the years to come."

**The Combined Company**

The combined company is expected to have electric and natural gas delivery operations in eight states with assets totaling $29 billion and an enterprise value of $27 billion.

Headquartered in Houston, CenterPoint Energy has significant natural gas operations in Arkansas, Louisiana, Minnesota, Mississippi, Oklahoma and Texas, serving more than 3.4 million customers. The company also delivers electricity to more than 2.4 million customers in the greater Houston area. CenterPoint Energy's competitive natural gas sales and services business serves more than 100,000 customers in 33 states. The company employs nearly 8,000.

Headquartered in Evansville, Ind., Vectren provides natural gas to more than 1 million customers in Indiana and Ohio, and electricity to 145,000 customers in Indiana. Vectren's non-utility businesses include Infrastructure Services (VISCO), which provides underground pipeline construction, repair and replacement services, and Energy Services (VESCO), which offers performance contracting services and renewable energy project development. CenterPoint Energy intends to continue operating VISCO out of Indianapolis, Ind., and VESCO out of Newburgh, Ind. (near Evansville). Vectren also owns and operates power generation assets in Indiana with a production capacity of 1,248 megawatts. The company employs approximately 5,500.

Following the completion of the merger, the combined company expects to execute a unified business strategy focused on the safe and reliable delivery of electricity, natural gas and related services to customers.

**Advantages and Benefits**

By combining their experienced professionals and complementary businesses, CenterPoint Energy and Vectren believe they will create a strong, diversified company with compelling advantages and benefits:

- Opportunities to leverage combined talent, skills and resources to enhance already award-winning customer service levels;
- World-class workforce and financial resources to provide sustainable and innovative energy solutions;
- Ability to share best practices for service, reliability and technology across the combined company's footprint;
- Opportunities to leverage and expand competitive energy-related services across a larger U.S. footprint; and
- Combined company scale to create opportunities for long-term efficiencies in the delivery of services to customers.

**Earnings Impact**

With the merger, CenterPoint Energy expects to maintain an annual guidance basis

EPS growth target of 5 to 7 percent in 2019 and 2020, excluding any one-time charges related to the merger.

**Leadership**

At the closing of the transaction, Scott M. Prochazka will serve as president and CEO of the combined company. The full executive team for the combined company will be announced prior to or in conjunction with the closing of the merger. The natural gas utilities operations of the combined company, as well as that businesses' lead executive, will be headquartered in Evansville. Additionally, CenterPoint Energy will establish a chief business officer for Vectren's electric business who will directly report to CenterPoint Energy's CEO and spearhead southwestern Indiana's electric grid modernization and generation transition initiatives recently underway. In addition to utility field employees, CenterPoint Energy will retain key operational activities in support of the utilities in Evansville. Integration teams co-led by leaders from each company are in the process of being established and will be centered in Evansville. These teams will be responsible for identifying best practices and facilitating the integration of the two companies. California.

**B.  The Materially Misleading Proxy Statement Prevents Stockholders from Making an Informed Decision**

32.     As noted previously, on June 18, 2018, the Company filed the Proxy Statement with the SEC in support of the Proposed Transaction.  As alleged herein, the Proxy Statement contained material misrepresentations and omissions of fact that force Vectren's stockholders to decide whether to vote their shares without adequate information.

33.     Designed to convince shareholders to vote in favor of the Proposed Transaction their shares, the Proxy Statement is rendered misleading by the omission of information relating to: (i) the Sales Process leading up to the Proposed Transaction; (ii) the Company's financial projections; and (iii) the valuation analyses performed by the Company's financial advisor Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), in support of its fairness opinion. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to Vectren's stockholders.

34.     As a result of the above-referenced misleading statements and omissions in the

Proxy Statement, Defendants violated Section 14(a) and 20(a) of the Exchange Act.

### *Material Omissions Relating to the Sales Process*

35.    With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Proxy Statement indicates that the Company entered into confidentiality agreements with five potential bidders, all of which contained standstill provisions. However, details regarding the terms of these agreements, including whether they are still in effect and/or contain "don't ask, don't waive" provisions that prohibit these entities from making an unsolicited superior proposal to Vectren are worryingly absent from the Proxy Statement.

36.    The absence of this information is troubling. Following a January 19, 2018 board meeting, Vectren elected to continue discussions with six potential counterparties about a strategic transaction, and to request from each of them a non-binding indication of the terms and conditions on which they would consider acquiring the Company. To facilitate this process:

> BofA Merrill Lynch contacted the six interested potential counterparties to inform them that the Board had decided to proceed with discussions about a potential transaction and that they would be provided with additional information about the Company following execution of a confidentiality and standstill agreement. All six parties were provided with a form of confidentiality and standstill agreement.

Proxy Statement at 19.

37.    Of the six potential bidders that were contacted, five executed confidentiality agreements, and four companies, CenterPoint Energy, and Bidders A, B, and D, each submitted non-binding indications of interest with respect to a strategic transaction with the Company.

38.    However, the Proxy Statement fails to indicate whether the confidentiality and standstill agreements the Company entered into with these potential buyers are still in effect and/or contain "don't ask, don't waive" ("DADW") provisions that are presently precluding these potential buyers from making a topping bid for the Company. The disclosure of the terms of the standstill provisions in the confidentiality agreements Vectren entered into with potential buyers

is crucial to Vectren stockholders. Without further information regarding the standstill provisions, or presence of DADW provisions, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect, Vectren stockholders are unable to properly evaluate the ability of these parties that earlier expressed interest in acquiring the Company to offer them a better deal. If those confidentiality agreements contained DADW provisions, then those bidders could only make a superior proposal by breaching the agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly.

39.     Thus, the omission of this information renders the descriptions of the confidentiality agreements the Company entered into materially incomplete and misleading, as the failure to disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. Clearly, any reasonable Vectren shareholder would deem the fact that the most likely potential topping bidder in the marketplace may be precluded from making a superior offer as significant information.

40.     Accordingly, without further information regarding the nature of the confidentiality agreements, the Company's stockholders are being misled into assuming that these four entities, which were actively interested in acquiring the Company, and had already elected to submit a bid to acquire the Company, could make an offer to acquire the Company if they so chooses – when they may be contractually precluded from doing so.

### *Material Omissions Concerning Vectren's Financial Projections and BofA Merril Lynch's Financial Analyses Financial Forecasts*

41.     The Proxy Statement discloses certain financial forecasts for the Company on page 40 of the Proxy Statement, but fails to provide material information concerning the Company's financial forecasts, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger.

42.     In detailing Vectren's management's financial projections, the Recommendation

Statement provides projected values for the years 2018-2027 for the following financial information: (i) net income; (ii) depreciation and ammoritzaition; (iii) EBITDA; and (iv) Capital Expenditures, excluding AFUDC equity:

| | Year Ended December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
| | | | | | (in thousands) | | | | | |
| Net Income | $ 236,739 | $ 257,429 | $ 280,241 | $ 309,123 | $ 346,054 | $ 392,277 | $ 424,703 | $ 484,833 | $ 527,872 | $ 566,943 |
| Depreciation and Amortization | $ 292,331 | $ 319,246 | $ 342,599 | $ 355,175 | $ 369,897 | $ 388,639 | $ 424,882 | $ 481,707 | $ 497,267 | $ 513,607 |
| EBITDA | $ 685,484 | $ 753,257 | $ 816,175 | $ 877,453 | $ 957,702 | $1,056,590 | $1,152,665 | $1,293,246 | $1,361,978 | $1,429,050 |
| Capital Expenditures, excluding AFUDC equity | $(631,551) | $(622,532) | $(599,633) | $(778,389) | $(959,427) | $ (856,742) | $ (637,391) | $ (606,594) | $ (620,404) | $ (594,048) |

However, nowhere in the Proxy Statement does Vectren quantify or disclose any information related to unlevered free cash flow projections ("UFCF"). In light of the fact that UFCF projections were utilized by BofA Merrill Lynch in their valuation calculations, including their discounted cash flow analyses, the Company's shareholders require this information to assess the fairness of the Merger Consideration and determine whether to vote in favor of the merger.

43.    Specifically, with respect to BofA Merrill Lynch's Discounted Cash Flow Analysis ("DCF"), the Proxy Statement discloses that "BofA Merrill Lynch performed a discounted cash flow sum-of-the-parts analysis of the Company to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that the Company was forecasted to generate during our fiscal years 2018 through 2027 based on our management forecasts." However, the Proxy Statement fails to disclose (i) the definition of UFCF; (ii) a reconciliation of UFCF to its most comparable GAAP compliant financial measure; or (iii) the line items used in its calculation. Additionally, detailing the DCF Analysis performed by BofA Merrill Lynch the Proxy Statement fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the various discount rate ranges utilized, including the value of WACC components; (ii) the value of the net debt used to adjust the enterprise values; and (iii) the actual terminal values calculated.

44.    These key inputs are material to Vectren shareholders, and their omission renders the summary of BofA Merrill Lynch's DCF valuation analysis incomplete and misleading. In light of the fact that the Board's unanimous recommendation that shareholders vote in favor of the Proposed Transaction was based in part on the opinion of BofA Merrill Lynch that the

consideration being offered to Vectren stockholders is fair from a financial point of view, this information must be disclosed. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78.

45.     The lack of information related to BofA Merrill Lynch's is not limited solely to BofA Merrill Lynch's DCF valuation analysis. In fact, with respect to BofA Merrill Lynch's *Selected Publicly Traded Companies Analysis* and *Selected Precedent Transactions Analysis* the Proxy also fails to disclose the individual multiples for each company and transaction utilized in the analysis. The omission of these multiples renders the summary of the analyses and the corresponding implied equity value reference ranges materially misleading.

46.     Based on the foregoing, the Proxy Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading Vectren stockholders. Vectren public shareholders lack critical information necessary to evaluate whether the Proposed Transaction

truly maximizes shareholder value and serves their interests. Moreover, without the key financial information and related disclosures, Vectren public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by BofA Merrill Lynch, and whether they can reasonably rely on their respective fairness opinions.

47.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS FOR RELIEF

## COUNT I

### Claims Against All Defendants for Violations of § 14(a) of the Securities Exchange Act of 1934

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy statement communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51.     The omission of information from a proxy statement will violate Section 14(a) and

Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52.     Here, Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) the Company's financial projections; (ii) the valuation analyses performed by the Company's financial advisor BofA Merrill Lynch, in support of its fairness opinions; and (iii) the Background of the Merger.

53.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to Vectren common stockholders although they could have done so without extraordinary effort.

54.     The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy Statement states that BofA Merrill Lynch reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by BofA Merrill Lynch, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement

identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review BofA Merrill Lynch's analyses in connection with their receipt of the fairness opinion, question the advisors as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

56.    Vectren is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy Statement.

57.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and Vectren stockholders, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Vectren stockholders have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Vectren stockholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for
### Violations of § 20(a) of the 1934 Act

58.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Vectren within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Vectren and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

60.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

61.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

62.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

64.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by

their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as follows:

(A)     declaring that the Proxy Statement is materially false or misleading;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(D)     directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 11, 2018

**SHARTZER LAW FIRM, LLC**

By: _/s/ Jason A. Shartzer_
Jason A. Shartzer, Atty. No. 23989-49
156 E. Market Street
10th Floor, Suite 1000
Indianapolis, IN 46204
(317) 969-7600
(317) 969-7650 Fax
Email: jshartzer@shartzerlaw.com

**LEVI & KORSINSKY, LLP**
Donald J. Enright (to be admitted _pro hac vice_)
Elizabeth K. Tripodi (to be admitted _pro hac vice_)
1101 30th Street NW, Suite 115

Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567f
Email: denright@zlk.com

*Counsel for Plaintiff*